UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

RESER'S FINE FOODS, INC., a
domestic business corporation,

        Plaintiff and
        Counterclaim Defendant,

    v.

BOB EVANS FARMS, INC., a Delaware
corporation; BOB EVANS FARMS LLC,
an Ohio limited liability company; and BEF
FOODS, INC., an Ohio-based corporation,

        Defendants and
        Counterclaim Plaintiffs.

Case No. 3:13-cv-00098 AA

OPINION AND ORDER

_____

AIKEN, Judge:

    In January 2013, plaintiff Reser's Fine Foods, Inc. (Reser's) filed suit against defendants

alleging breach of a non-disclosure agreement, misappropriation of trade secrets, and conversion.

Defendants subsequently brought counterclaims for intentional interference with economic

relations, violations of the Lanham Act, unfair competition, breach of contract, fraud, and

promissory estoppel. Ultimately, Reser's dismissed its claims, and defendants dismissed one

intentional interference claim and their Lanham Act and unfair competition claims. The parties

also agreed that BEF Foods, Inc. (BEF) was the sole party in interest asserting counterclaims.

1 - OPINION AND ORDER

Reser's now moves for summary judgment on BEF's remaining counterclaims for breach of contract, promissory estoppel, fraud, and intentional interference with economic relations, and BEF moves for partial summary judgment on a pricing contract counterclaim. Reser's also moves to exclude the opinion of BEF expert Robert Nardone.

For the reasons explained below, Reser's motion for summary judgment is granted on BEF's formula pricing promissory estoppel claim (Fourth Claim for Relief, Count 3) and BEF's implied-in-fact ongoing and holiday supply contract claims (Third Supplemental Claim for Relief, Counts 2 and 4). Reser's motion is denied in all other respects, as is BEF's motion for partial summary judgment. Reser's motion to exclude the expert testimony of Robert Nardone is granted in part and denied in part, with leave to renew prior to trial.

## I. BACKGROUND

Reser's is a family-owned and operated Oregon corporation that develops and manufactures refrigerated food products to sell to restaurants and grocery retailers across the United States. Reser's sells refrigerated side dishes under its own brand and also manufactures products to be sold under other companies' brands. Hawkes Decl. Ex. 1 (Mark Reser Decl. 3).[1] BEF is an Ohio-based corporation that operates full-service restaurants and sells retail food products under the Bob Evans brand to grocery retailers across the United States.

Until late 2013, Reser's and BEF had a long-standing business relationship in which Reser's developed, produced, and packaged a variety of food products, including "hot-fill" side dishes, for BEF to sell under the Bob Evans brand.[2] *See* Hawkes Decl. Ex. 12 at 2 (letter to BEF

---

[1] Unless otherwise noted, cited declarations and exhibits are those submitted in support of, and in opposition to, Reser's motion for summary judgment.

[2] In the late 1990s, Reser's developed a process for preparing refrigerated side dishes with an extended shelf life. During this "hot-fill" process, food is cooked in large kettles at a high

2 - OPINION AND ORDER

from Reser's noting that the parties' relationship began in the mid-1990s). The parties' business relationship is commonly known as a "co-packing" relationship, in which a manufacturer, or co-packer, manufactures and packages a food product under the brand of another company. The brand owner then markets and sells the product to retailers. Here, Reser's served as a co-packer for BEF by providing food items to be sold under the Bob Evans brand.

In 2005, the parties entered into a Master Supply Agreement (MSA) governing their co-packing relationship. Hawkes Decl. Ex. 3. The MSA required Reser's to manufacture and to sell to BEF, and BEF to order and purchase from Reser's, certain side dish products according to a fixed pricing schedule. *Id.* Ex. 3 at 4. The MSA also permitted BEF to purchase similar products from third parties "if, based on [Bob Evans'] reasonable determination, [Bob Evans] is purchasing Products [from Reser's] at a rate greater than eighteen (18) million annualized pounds." *Id.* Ex. 3 at 3. The MSA governed the time period from January 31, 2005 to July 31, 2008, and it specifically provided that it "may not be amended, superseded or altered except by an instrument in writing duly executed and delivered on behalf of each of the parties." *Id.* Ex. 3 at 10.

In 2006 and 2007, the parties negotiated a price increase at Reser's request, effectively modifying the pricing schedule of the MSA. Hall Decl. 3-4 & Exs. 3-6. BEF agreed to the price increase, which became effective on May 1, 2007.

As the termination date of the MSA approached, the parties discussed entering into another supply agreement. The parties could not agree on several terms, and no new written agreement was signed by Reser's. Nonetheless, in 2008 the parties negotiated and agreed to raise

---

temperature to kill bacteria in the food, and the food is then poured into package containers, sealed while still hot, and immediately cooled. *See* Mark Reser Decl. 3.

prices by a fixed increase per unit through May 1, 2010, allow Reser's to sell sides similar to BEF's in grocers' deli cases, end a rebate program included in the written MSA, and establish a new online auction program. Hall Decl. 4-11 & Exs. 11-17.

Beginning in 2006, Reser's had developed a process to create the browned topping that is characteristic of a baked casserole dish for some of its hot-fill side dishes (referred to as "baked side dishes"). Mark Reser Decl. 4. In 2009, Reser's launched its baked side dish products and offered to co-pack the new items for BEF, and BEF began ordering baked side dishes.

In 2010, as the end of the 2008 fixed pricing agreement approached, Reser's and BEF negotiated a formula-pricing arrangement for side dishes containing commodities such as butter, milk, or margarine (referred to as "commodity sides"). *See* Hall Decl. 13-18 & Exs. 24-31. For these products, Reser's would adjust prices quarterly to account for changes in the commodities market and would adjust prices annually to account for non-commodity factors. Hawkes Decl. Ex. 4 (Hall Dep. 100:23-103:21). The parties abided by this agreement until November 2012.

In May 2012, Reser's made an annual price adjustment for commodity and non-commodity sides, and, due to the amount of the price increase, BEF responded that it would order some of its side dish requirements from another supplier. Brunette Decl. Exs. 41-44; Hall Decl. 19. In June 2012, Reser's requested that BEF provide fall and winter supply forecasts to anticipate the reduced volume; BEF's forecast reflected a reduction in anticipated orders, though BEF maintains that the forecast increased orders for baked side dishes and "would have boosted" the total volume of orders "substantially." Gerber Decl. 2-6 & Ex. 6; Brunette Decl. Exs. 37-39, 48, 49, 68; Townsley Decl. 5 & Ex. 3. Reser's contends that the volume of BEF's forecast was higher than the amount it actually expected to order from Reser's. Hawkes Decl. Ex. 10.

4 - OPINION AND ORDER

In August 2012, BEF purchased Kettle Creations, a company also in the business of producing hot-fill side dishes. BEF did so to "vertically integrate" a portion of its supply chain rather than rely on outside sources for all of its supply needs. Townsley Decl. 4-5 & Ex. 1; Hawkes Decl. Ex. 8. After BEF purchased Kettle Creations, Reser's began to view BEF as a competitor rather than a client and suspected that BEF would begin to produce its own line of baked side dishes. In fact, BEF did so and began delivering its version of baked sides to retail customers in November 2012.

On August 23, 2012, as a result of BEF's acquisition of Kettle Creations, Reser's informed BEF that it would no longer supply baked side dish items as of October 19, 2012. Hawkes Decl. Ex. 12. Reser's assured BEF that it would continue to provide other types of hot-fill side dishes. *Id.* Ex. 12 at 2 ("To be clear, [Reser's] will continue to fill all other products orders with the quality and service you've come to expect from Reser's over the years.").

On September 21, 2012, BEF emailed a one-year supply forecast to Reser's and stated:

> In light of Resers' recent decision to cease providing Oven Bake products to BEF Foods Inc, by this e-mail we are requesting that Resers confirm that it will manufacture and supply the products listed on the attached Forecast materials for non Oven Bake products for the period as provided in the Forecast and under the same terms and conditions as Resers have [sic] previously supplied such products.

Hawkes Decl. Ex. 18. BEF also asked that Reser's confirm supply through September 2013 in writing. *Id.* Reser's did not provide the written commitment sought by BEF.

On November 1, 2012, Reser's sent BEF an email with new quarterly pricing for commodity sides. Hawkes Decl. Ex. 24. Between November 2 and November 12, 2012, BEF submitted orders for commodity items at the November 1 quoted prices, and Reser's apparently accepted those orders.

5 - OPINION AND ORDER

On November 14, 2012, Reser's informed BEF of another price increase for commodity sides, effective December 3, 2012, "due to the recent change in our relationship coupled with the competitive landscape." Hawkes Decl. Ex. 26 at 5. Apparently, Reser's increased its prices in response to BEF's decision to move some of its business to another supplier. Brunette Decl. Ex. 8 (Mark Reser Dep. 168:12-21) ("In mid summer of '12, we received verbal notification [from BEF] of significant volume declines or projections…They had very, very favorable pricing based on their book business. Half that book of business goes away, they do not receive the same favorable pricing they received previously."). BEF protested the November 14 price advance, asserting that Reser's was committed to the November 1, 2012 price quote for the remainder of the quarter, or through January 30, 2013. Hawkes Decl. Ex. 27. Reser's refused to reverse the November 14 price advance.

On November 27, 2012, BEF submitted purchase orders for commodity sides pursuant to the November 1, 2012 pricing. Reser's rejected those purchase orders. BEF revised its purchase orders to reflect the price increase of November 14, 2012 and continued to submit purchase orders pursuant to that pricing schedule. Gerber Decl. 8-19 & Exs. 9-10 (doc. 214).

During this time, BEF began developing contingency plans to find an alternative source of hot-fill sides or to produce its own side dishes at the Kettle Creations plant. *E.g.,* Hawkes Decl. Ex. 28. BEF continued to submit orders to Reser's for the supply of hot-fill side dishes, and Reser's continued to accept those orders.

On January 17, 2013, Reser's filed this suit alleging that BEF misappropriated trade secrets, breached the parties' Non-Disclosure Agreement, and committed conversion by allegedly using Reser's confidential and proprietary information and/or trade secrets to develop

6 - OPINION AND ORDER

its baked side dish products. BEF filed counterclaims for intentional interference with economic relations, breach of contract, Lanham Act violations, and unfair competition.

During 2013, BEF attempted to obtain a commitment from Reser's to provide hot-fill side dishes through the 2013 holiday season. *E.g.,* Suppl. Hawkes Dec. Ex. 1 (Gerber Dep. at 175:16-176:10). Although Reser's did not provide formal confirmation, it contacted BEF in May 2013 and asked, "will we be producing for you or not? Got sleeves." Gerber Decl. Ex. 9. Shortly afterward, Reser's requested that BEF provide an order forecast for certain seasonal items. *Id.* Ex. 10. On June 25, 2013, Reser's stated it would review BEF's projected volume and inform BEF whether it would provide the forecasted volume of side dishes. Hawkes Decl. Ex. 50.

On August 7, 2013, BEF again sought a commitment from Reser's to supply side dishes for the 2013 holiday season. Gerber Decl. Ex. 16. On August 14, 2013, BEF submitted orders for holiday sides for delivery in October 2013.

On August 19, 2013, Reser's informed BEF that it would no longer provide hot-fill products to BEF after the last shipments were delivered on or before Monday, September 9, 2013. Gerber Decl. Ex. 18.

After Reser's terminated the parties' co-packing relationship, BEF brought contract and tort counterclaims arising from Reser's termination of the parties' supply arrangement. *See* BEF's Suppl. Ans. (doc. 113).

In September 2013, Reser's moved to voluntarily dismiss its claims against BEF; the court ultimately granted the motion. In November 2014, BEF dismissed its Lanham Act and unfair competition counterclaims and one intentional interference counterclaim. Remaining are BEF's contract and tort counterclaims alleged in its Fourth Claim for Relief and its First, Second and Third Supplemental Claims for Relief.

## II. DISCUSSION

Reser's moves for summary judgment on BEF's counterclaims for breach of contract, promissory estoppel, fraud, and intentional interference with economic relations. In turn, BEF moves for partial summary judgment on one breach of contract claim arising from Reser's November 2012 price increase for commodity sides.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. *Clicks Billiards Inc. v. Sixshooters Inc.,* 251 F.3d 1252, 1257 (9th Cir. 2001).

A.    Breach of Contract Claims

1.  Supply and Formula Pricing Claims

BEF alleges that Reser's breached the MSA, or alternatively, the parties' implied supply agreements, by terminating the supply of hot-fill and seasonal sides without reasonable notice. BEF's Suppl. Ans. (doc. 113) at 49-54, 57-59 (Third Suppl. Claim for Relief, Counts 1, 2 and 4); U.C.C. § 2-309(3) (a contract for the sale of goods requires reasonable notice of termination "except on the happening of an agreed event"); *see also* Ohio Rev. Code § 1302.22(C); Or. Rev. Stat. § 72.3090(3). BEF maintains that co-packing and supply chain businesses generally provide each other with advance notice of changes in pricing, order volumes, and availability of supply, and the approximately two weeks' notice given by Reser's was not reasonable under the circumstances. Hall Decl. 20-21; Gerber Decl. 15-16; Townsley Decl. 5-6; *see also* Brunette

8 - OPINION AND ORDER

Decl. Ex. 9 (Sakie Dep. 158:18-159:18, 203:16-19) (testifying that Reser's generally gave BEF advance notice of price increases); Nardone Decl. Ex. 1. BEF also alleges that Reser's November 14, 2012 price adjustment breached the parties' 2010 formula pricing agreement by making non-commodity price adjustments to commodity sides before the beginning of the next annual term on May 1, 2013.[3] BEF's Suppl. Ans. at 24-25 (Fourth Claim for Relief, Count 2).

In moving for summary judgment, Reser's argues that BEF cannot rely on the MSA to support its breach of contract claims, because the MSA expired by its terms on July 31, 2008. Reser's further argues that the formula pricing agreement and the alleged implied supply agreements are unenforceable under the Statute of Frauds, given that none of the agreements was reduced to a writing with a quantity term. Hawkes Decl. Ex. 4 (Hall Dep. 103:22-104:25, 115:18-116:21) (pricing agreement was reached through oral negotiations and was independent of quantity), Ex. 5 (Gerber Dep. 57:12-25) (acknowledging that pricing agreements "were not tied to a tonnage, pound, or case – quantity amount").

An agreement for the sale of goods is subject to the Uniform Commercial Code (UCC) Statute of Frauds, which provides that "a contract for the sale of goods for the price of $500 or more is not enforceable...unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." Ohio Rev. Code § 1302.04(A); *see also* Or. Rev. Stat. § 72.2010(1).[4] The Statute of

---

[3]As BEF recognizes, its formula pricing claim is limited to the effective date of the price increase, December 3, 2012, through April 30, 2013, the end of the relevant annual period. *See* BEF's Opp'n at 36. No evidence suggests that the parties agreed to formula pricing indefinitely, and BEF does not contend that Reser's was obligated to comply with the formula pricing agreement beyond the quarterly and annual terms at issue. *E.g.* Hawkes Decl. Ex. 4 (Hall Dep. 105:9-22).

[4]Although Ohio law applies to the MSA by its terms, Oregon's choice-of-law rules dictate which forum's law applies to the alleged implied contracts. *Atl. Marine Constr. Co., Inc.*

9 - OPINION AND ORDER

Frauds also requires that the writing include a quantity term. Ohio Rev. Code § 1302.04 ("A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in such writing"); Or. Rev. Stat. § 72.2010(1) (accord); *see also* U.C.C. § 2-201, cmt. 1 ("The only term which must appear is the quantity term.").

In response to Reser's motion, BEF argues that the parties extended and modified the MSA to include the formula pricing agreement, as evidenced by the continuation of their supply relationship and their course of performance consistent with the agreed modifications. It is undisputed that the MSA is a written agreement and includes a minimum quantity term. Hawkes Decl. Ex. 3 at 3; UCC § 2-201, cmt. 1 (quantity "need not be accurately stated"). BEF further emphasizes that the parties' modifications to the MSA are evidenced through their written email communications, and, as modifications to a written contract, they need not include quantity terms to satisfy the Statute of Frauds. *See Copeland Corp. v. Choice Fabricators Inc.*, 345 Fed. App'x 74, 77 (6th Cir. Sept. 1, 2009) ("Copeland cites no authority, and we are aware of none, requiring *all* written modifications to include a quantity term. Nor does § 1302.12(C) mention any such requirement....In the absence of any modification to the quantity term, moreover, there *is* a writing that satisfies this aspect of the statute of frauds – namely, the original contract."). Thus, if the evidence raises an inference that the parties extended the MSA and modified it to include the formula pricing agreement, Reser's Statutes of Frauds defense does not defeat BEF's breach of MSA and formula pricing contract claims on summary judgment.

---

*v. U.S. Dist. Ct.*, 134 S. Ct. 568, 582 (2013) ("A federal court sitting in diversity ordinarily must follow the choice-of-law rules of the State in which it sits."). Here, the UCC and the relevant laws of Ohio and Oregon do not differ in any significant respect.

BEF contends that the parties modified the MSA both before and after the written termination date in July 2008, and that the parties intended to extend the MSA through their subsequent modifications. For example, BEF notes that in 2007, the parties agreed to modify the fixed pricing schedule of the MSA. Hawkes Decl. Ex. 3 at 4; Hall Decl. 3-4 & Exs. 3-5. Further, as the termination date of the MSA approached in 2008, the parties negotiated and ultimately agreed to another modification of the fixed pricing schedule until May 2010, among other agreed terms. *See* BEF's Opp'n at 25-26; Hall Decl. at 4-11 & Ex. 11-17; Brunette Decl. Ex. 23-26. BEF emphasizes that these negotiations culminated in June 2008, immediately prior to the MSA's written expiration date, and that the parties complied with the 2008 fixed pricing modification for two years, as agreed. BEF contends that these facts raise the inference that the parties intended to continue their business relationship under the MSA's terms, as modified, beyond July 2008. *See* Hall Decl. 9.

BEF also cites the 2010 parties' formula pricing negotiations and agreement, arguing that this agreement further modified the existing MSA under which the parties were operating. Hall Decl. 13-18 & Exs. 23-24, 25 (Dec. 2009 Reser's email discussing items such as formula pricing and stating, "We look forward to continuing to strengthen our partnership in 2010"); 26-31. BEF points out that, as with the 2008 fixed pricing agreement, the parties acted in accordance with the 2010 formula pricing agreement until their relationship turned adversarial in the fall of 2012. Hall Decl. & Exs. 1-11 (doc. 215). BEF maintains that, aside from these modified terms, the parties' co-packing relationship continued as it had under the original MSA. Hall Decl. 3, 5, 11, 18, 20[5]; Averill Decl 2; Brunette Decl. Ex. 4 (Hall Dep. 60:22-61:23, 62:15-67:21, 91:6-92:6).

--------

[5]Reser's contends that Hall's declarations contradict his deposition testimony and should be disregarded as sham affidavits. *See Nelson v. City of Davis*, 571 F.3d 924, 928 (9th Cir. 2009) ("The rationale underlying the sham affidavit rule is that a party ought not to be allowed to

11 - OPINION AND ORDER

Notably, as Reser's emphasizes, the express terms of the MSA require all modifications to be in writing, which necessarily would include an extension of the MSA. Hawkes Decl. Ex. 3 at 3 (the MSA "may not be amended, superseded or altered except by an instrument in writing"). BEF nonetheless argues that by continuing their existing co-packing relationship and performing in accordance with the agreed 2008 and 2010 modifications, the parties extended the MSA and waived its written modification requirement through their course of conduct. *See* Ohio Rev. Code § 1301.303(F) (course of performance inconsistent with written contract term is relevant to determine waiver or modification of the written term); *id.* § 1302.12(D) (attempt at modification or rescission of contract can act as a waiver of written requirement); *Kwikcolor Sand v. Fairmount Minerals, Ltd.*, 2011 WL 6775580, at *4-5 (Ohio App. Dec. 22, 2011) (by performing under an oral modification of a pricing schedule, the parties "waived any right to enforce the stringent modification requirement"); *Fields Excavating, Inc. v. McWane, Inc.*, 2009 WL 3721013, at *3 (Ohio App. Nov. 9, 2009) ("if the parties go on to make an oral modification after they agreed on a no-oral-modification clause, then their subsequent agreement must be taken as itself modifying, or at least waiving, the no-oral-modification clause"); *Wright v. State Farm Mut. Auto. Ins. Co.*, 223 Or. App. 357, 371-72, 196 P.3d 1000 (2008) (conduct arguably inconsistent with a written contract term raises issue of fact as to waiver of that term). At minimum, BEF maintains that the evidence is sufficient to raise a genuine issue of material fact as to whether the parties intended to extend and modify the MSA.

---

manufacture a bogus dispute with *himself* to defeat summary judgment."). I do not find Hall's declarations to contradict his deposition testimony so as to warrant disregarding them entirely. Rather, Hall's declarations seek to clarify aspects of his deposition testimony and the basis for BEF's claims. *Scamihorn v. General Truck Drivers*, 282 F.3d 1078, 1085 n.7 (9th Cir. 2002). Whether Hall's clarifications are persuasive is a matter for the trier of fact.

12 - OPINION AND ORDER

As BEF acknowledges, the parties did not expressly extend the MSA, and their 2008 and 2010 negotiations do not reference the MSA or its terms. *E.g.,* Hall Decl. Exs. 7-17. Further, evidence of written but unexecuted MSA amendments show that the parties attempted and failed to negotiate a new written MSA, suggesting that the parties would have executed a formal extension of the MSA had they so intended. Hall Decl. Exs. 18-22. Moreover, Reser's contends that BEF fails to present clear and convincing evidence to show that Reser's waived the written modification requirement of the MSA or agreed to an extension of the MSA. *Star Leasing Co. v. G & S Metal Consultants, Inc.*, 2009 WL 714146, at *7 (Ohio App. Mar. 19, 2009) (waiver of no-oral-modification clause can be shown through clear and convincing evidence of modification); *Frantz v. Van Gunten*, 521 N.E.2d 506, 510-11 (Ohio App. 1987) (accord). Reser's emphasizes that the parties' 2007 negotiations culminated in email confirmation of the agreement, contradicting any inference that Reser's previously waived the MSA's written modification requirement. Reser's further maintains that its conduct is consistent with the expiration of the MSA and the creation of a purchase-order-to-purchase-order relationship, and, therefore, cannot establish a clear and unequivocal waiver of a contractual right.

While I find Reser's argument and interpretation of the evidence persuasive, I must construe all inferences in favor of BEF on summary judgment. In doing so, I cannot ignore evidence of the parties' long-standing supply relationship, the parties' previous modification of the MSA, the parties' pricing and other agreements in 2008 and 2010, the parties' continued performance under the 2008 and 2010 pricing agreements, and the uninterrupted continuation of their supply arrangement after July 2008. Hall Decl. & Exhibits; Hawkes Decl. Ex. 4 (Hall Dep. 65:7-17) ("during the period from July 31, 2008, until 2013, we also had discussions with Reser's regarding price changes and changing from fixed prices to formulated price,

13 - OPINION AND ORDER

and…business type discussion that you go through as business partners"). The nature and timing of the 2008 and 2010 negotiations and agreements, the parties' performance under the agreements, and their continued co-packing relationship support an inference that the parties modified the MSA and intended to extend its terms, as modified. *See, e.g., High Concrete Technology, LLC v. Korolath of New England, Inc.*, 665 F. Supp. 2d 883, 889 (S.D. Ohio 2009) ("The Court agrees with Korolath that the parties' continued course of dealing over a twenty-year period shows they never mutually rescinded the 1986 agreement.").

In fact, Reser's acknowledged an "agreement" or "partnership" between the parties as late as 2012, furthering the inference that the MSA was extended. Brunette Decl. Ex. 7 (McCarthy Dep. 122:12-123:4) (testifying that an "agreement" referenced in a Dec. 2012 email related to a "general agreement" governing Reser's "manufacturing of products for Bob Evans"); *id.* Ex. 59 (Dec. 2012 email stating that the "only reason" Reser's did not "have more if not all distribution" in certain regions was "the BE agreement"); *see also id.* Ex. 54 (Reser's email on 9/20/2012 discussing "ridiculous contract" with BEF "that is going away"). Further, Reser's "Weekly Results" update from June 2012 indicates that Reser's was considering moving production of BEF mashed potatoes from one plant to another, and that Reser's would "require BEF approval to make the change." Brunette Ex. 69 at 4. If the parties had no ongoing supply agreement, as Reser's contends, it is questionable why Reser's would need to obtain BEF's approval to move production of mashed potatoes.

Moreover, evidence suggests that the parties orally agreed to terms that were not part of the MSA, such as meat department exclusivity for BEF products. An agreement for BEF's meat department exclusivity existed as early as 2004, and Reser's acknowledged this agreement or "contract" with BEF as late as 2012. Hall Decl. 2-3 & Ex. 2 (2004 letter from Reser's

14 - OPINION AND ORDER

acknowledging its meat department restriction); Ex. 7, Ex. 10 (Sirgy Dep. 87:17-88:11) (acknowledging BEF had "exclusivity" in meat departments in 2008), Ex. 24 (2009 email exchange identifying "meat dept. exclusivity" as a topic of discussion between the parties); Brunette Decl. Ex. 25 (May 2008 letter from Reser's offering terms for agreement, including that "Bob Evans will retain Branded exclusivity in the Meat Dept."); Ex. 54 (Sept. 2012 email stating, "The reasons for the different [meat and deli] product lines has to do with the ridiculous contract we had with Bob Evans but now that is going away we can do things differently"), Ex. 70 at 3 (July 2012 meeting minutes indicating that Reser's must sell potatoes in the dairy section of stores within BEF territory), Ex. 104 (2008 email from BEF noting that Reser's products were displayed in meat departments and Reser's responding that it would "take care of it"), Ex. 108 (Jan. 2011 email discussing a dispute over the parties' "verbal" agreement regarding meat department exclusivity), Ex. 109 (Feb. 2012 email exchange recognizing meat case exclusivity for BEF products). In short, the parties acknowledged and performed in accordance with an oral exclusivity agreement before, during, and after the MSA's stated term, raising an interference that the parties had waived the MSA's written modification requirement. Combined with evidence of an "agreement" acknowledged by Reser's and the parties' performance of 2008 and 2010 pricing agreements, evidence of a prior waiver raises the inference that the parties again waived the written modification requirement in extending and modifying the MSA.

Reser's nonetheless maintains that this evidence fails to show, as a matter of law, "a clear, unequivocal, decisive act" on the part of Reser's to waive the written modification argument. *Monreal Funeral Home, Inc. v. Ohio Farmers Ins. Co.*, 937 N.E.2d 159, 164 (Ohio App. 2010) (citations omitted). While Reser's skillfully argues that its conduct and communications were not "unequivocal" and could be construed as consistent with a purchase-

15 - OPINION AND ORDER

order relationship, I would need to make findings of fact and evaluate deposition testimony to agree with Reser's and grant summary judgment.

Significantly, this case does not involve several purchase orders made over the course of a few months or even a few years; the relevant evidence must be considered as a whole, rather than in a vacuum, and in the context of the parties' course of conduct. Evidence of the parties' supply relationship and their ongoing negotiations and agreements is simply too extensive for the court to find, as a matter of law, that the MSA expired and the parties' long-term, chain-of-supply relationship was reduced to nothing more than a purchase-order-to-purchase-order arrangement. This is especially true in light of the volume of products manufactured by Reser's and purchased by BEF, and the value each party placed on the other's business; the parties essentially considered themselves business "partners." Hall Decl. Ex. 13 (letter from Reser's referring to BEF as its "business partner"), Ex. 17 at 3 (2008 email from Reser's stating that it looked forward to "many more successful years of a true partnership"), Ex. 24 (2009 email exchange referencing a "follow up to our partnership session"), Ex. 25 (Dec. 2009 email from Reser's stating, "We look forward to continuing to strengthen our partnership in 2010"); Brunette Decl. Ex. 25 (May 2008 letter from Reser's referring to itself as BEF's "business partner"); Ex. 34 (2012 letter from Reser's referring to BEF as its "strategic business partner"); Gerber Decl. 10 (doc. 214) (describing the volume of products ordered).

Ultimately, whether Reser's conduct constitutes a clear and convincing waiver requires sifting through and weighing facts and testimony in the context of the parties' co-packing relationship, and that task is reserved to the finder of fact. *Fields*, 2009 WL 3721013, at *4 ("Ohio courts consistently treat the issue of whether a no-oral-modification clause is waived as a question for the trier of fact."); *Fahlgren & Swink, Inc. v. Impact Res., Inc.*, 1992 WL 385941, at

16 - OPINION AND ORDER

*5 (Ohio App. Dec. 24, 1992); *Wright*, 223 Or. App. at 368-69. Accordingly, I find that questions of fact exist as to whether the parties waived the written modification requirement and extended and modified the MSA, and whether Reser's was obligated to comply with the formula pricing agreement and to provide BEF with reasonable notice before terminating the MSA. [6]

Alternatively, BEF alleges that Reser's breached "implied-in-fact" ongoing and holiday supply agreements, and that sufficient evidence of the parties' agreements exists to defeat the Statutes of Frauds.[7] BEF's Third Suppl. Claim for Relief, Counts 2 and 4; *see also* BEF's Opp'n at 32-33. BEF relies on the parties' conduct and course of dealing to support its implied contract claims. *See* Ohio Rev. Code § 1302.07 (recognizing that the parties' conduct can support the existence of a contract); Or. Rev. Stat. § 72.2040; U.C.C. § 2-204. BEF maintains that the parties' extensive communications and performance of the 2008 and 2010 pricing agreements support an inference of an ongoing supply agreement between the parties, as evidenced by their "placing and filling orders and arranging transportation, and extensive cooperation in research and development, scheduling, forecasting, and marketing." BEF's Opp'n at 33; Hall Decl. 11; Gerber Decl. 3-5 (doc. 214). BEF also emphasizes that the parties gave each other advance notice of anticipated changes in pricing, volume demand, and product discontinuations, which suggests an ongoing supply relationship. Brunette Decl. Ex. 6 (MacLennan Dep. 54:20-56:8);

---

[6] Reser's emphasizes that BEF executive Richard Hall testified that he was not aware of a contractual provision or email agreement that required Reser's to give BEF any notice before terminating supply. Hawkes Decl. Ex 4 (Hall Dep. 97:3-11, 211:1-15). Regardless of whether the parties agreed to a specific notice provision in the MSA or in an email, the UCC requires reasonable notice before terminating a contract of indefinite duration. Whether Reser's gave reasonable notice of termination is obviously a question of fact.

[7] BEF also asserts that the parties formed an "implied in fact" agreement to modify and extend the MSA. *See* BEF's Opp'n at 31-32. I do not find this argument distinguishable from BEF's argument that the parties agreed, through their negotiations and conduct, to extend the provisions of the MSA and waive the written modification requirement. Therefore, I decline to address it separately. BEF does not allege an implied in fact formula pricing agreement.

Ex. 9 (Sakie Dep. 52:2-53:23, 55:20-56:17, 57:3-17, 158:18-159:18, 203:6-19); *see also id.* Exs. 26, 37, 39, 63, 64; Gerber Decl. 15-16 & Exs. 1-8; Hall Decl. 20-21. Further, in October 2012 Reser's assured BEF that it would continue to supply hot-fill sides and arguably indicated a willingness to supply holiday sides. Hawkes Decl. Ex. 12 at 2 ("To be clear, [Reser's] will continue to fill all other products orders with the quality and service you've come to expect from Reser's over the years."); *see also* Brunette Decl. Ex. 79 (Feb. 2013 email from Reser's requesting that BEF provide a potato forecast for Aug. 2013 through Aug. 2014 and stating that Reser's "wants to be in a position to fill your needs"); Gerber Decl. Ex. 9 (email from Reser's stating, "will we be producing for you or not? Got sleeves").

I find that the evidence as a whole supports the inference of an implied ongoing supply contract and arguably an implied holiday supply agreement. At minimum, the parties' long-standing supply relationship, course of conduct, and Reser's August 2012 assurance create genuine issues of material fact. However, even if implied supply agreements existed between the parties, the question remains whether they are enforceable under the Statute of Frauds. U.C.C. § 2-201, cmt. 4 ("Failure to satisfy the requirements of this section does not render the contract void for all purposes, but merely prevents it from being judicially enforced in favor of a party to the contract."); *id.* § 202-4, cmt. (although parties' conduct may establish existence of a contract, the "legal effect of such an agreement is, of course, qualified by other provisions of this Article"); Ohio Rev. Code § 1302.07 (accord); Or. Rev. Stat. § 72.2040; *e.g., General Dynamics Corp. v. United* States, 563 U.S. 478, 488 (2011) (the Statute of Frauds "assumes a valid, enforceable agreement between the parties but nevertheless leaves them without a remedy").

As Reser's emphasizes, the Statute of Frauds precludes enforcement of a contract for the sale of goods that is not reflected in a writing with a stated quantity term. U.C.C. § 2-201(1);

18 - OPINION AND ORDER

Ohio Rev. Code § 1302.04(A); Or. Rev. Stat. § 72.2010(1). In fact, "[q]uantity is generally the only term that is required for contract formation." *H&M Landscaping Co., Inc. v. Abraxas Salt, LLC*, 2010 WL 3441935, at *3 (Ohio App. Sept. 2, 2010); *see also GPL Treatment, Ltd. v. Louisiana-Pacific Corp.*, 323 Or. 116, 123, 914 P.2d 682 (1996) (to satisfy the UCC statute of frauds, the writing must "include a quantity term"). Consequently, "if a contract lacks a quantity term, it runs afoul of the Statute of Frauds and is not enforceable." *Orchard Group, Inc. v. Konica Med. Corp.*, 135 F.3d 421, 428 (6th Cir. 1998); *see also Centro Nautico Representacoes Nauticas, LDA v. Int'l Marine Co-op, Ltd.*, 719 So.2d 967, 969 (Fla. App. 1998), *rev'd on other grounds*, 761 So.2d 279 (Fla. 1999) (holding that an oral contract fell within the Statute of Frauds and "as a matter of law there was no right to reasonable notice of termination because the agreement was unenforceable"). Here, BEF identifies no writing with quantity terms to support implied ongoing or holiday supply agreements, and, as Reser's points out, BEF cannot rely on the parties' course of dealing to supply a necessary quantity term. *Boydstun Metal Works, Inc. v. Cottrell, Inc.*, 519 F. Supp. 2d 1119, 1131 (D. Or. 2007) ("A quantity may be ascertained from the parties' past course of dealing. However, course of dealing cannot supply a missing quantity term if the contract is completely silent as to quantity."); *H&M Landscaping*, 2010 WL 3441935, at *4 (holding that "course of performance information does not help [the plaintiff] overcome the lack of a quantity term in the agreement").

BEF nonetheless insists that the lack of a quantity term does not preclude enforcement of contract obligations unrelated to quantity. BEF emphasizes that it seeks to enforce Reser's obligation to give reasonable notice before terminating the parties' supply agreements rather than a specific quantity obligation. However, the cases cited by BEF do not support its argument. *See* BEF Opp'n at 40-41. The cases of *Fuchs, O.N. Jonas Co.,* and *Pepsi-Cola Co.* involved

requirements contracts, and *Kubik* dealt with a requirements and exclusive dealings contract.[8] In those situations, courts have held that a quantity term is not needed to comply with the Statute of Frauds. *O.N. Jonas Co., Inc. v. Badische Corp.*, 706 F.2d 1161, 1165 (11th Cir. 1983); *Pepsi-Cola Co. v. Steak 'n Shade, Inc.*, 981 F. Supp. 1149, 1159 (S.D. Ind. 1997); *Kubik v. J & R Foods of Or., Inc.*, 282 Or. 179, 187 (1978); *Fuchs v. United Motor Stage Co.*, 21 N.E.2d 669, 672 (Ohio 1939).

In contrast, the parties here had a non-exclusive supply agreement. I recognize that the principles underlying the quantity exception for requirements and exclusive supply contracts arguably apply with equal force to non-exclusive supply contracts. *See Advent Sys., Ltd. v. Unisys Corp.*, 925 F.2d 670, 678 (3d Cir. 1991) ("The same reasons that led courts to dispense with a specific and certain quantity term in the exclusive requirements context apply equally when a continuing relationship is non-exclusive. The same regulating factor—good faith performance by the parties—applies and prevents the contracts from being illusory."). Regardless, BEF cites no Ohio or Oregon case recognizing an exception to the quantity requirement when the parties' supply relationship is non-exclusive. *E.g., Orchard Group, Inc.*, 135 F.3d at 427, 429 (applying Ohio law). Therefore, any implied ongoing or holiday supply agreement is unenforceable under the Statute of Frauds, and Reser's motion for summary judgment is granted on BEF's implied contract claims.

2.  The November-January Pricing Claim

Finally, BEF alleges that Reser's November 14 price advance breached the parties' specific pricing agreement for commodity sides sold between November 1, 2012 and January 30,

---

[8] "A requirements contract is "[a] contract in which a buyer promises to buy and a seller to supply all the goods or services that a buyer needs during a specified period." *H&M Landscaping*, 2010 WL 3441935, at *3 (quoting Black's Law Dictionary (8 Ed. 2004)).

2013. BEF Supp. Ans. at 23-24 (Fourth Claim for Relief, Count 1). Both parties move for summary judgment on this claim.

On November 1, 2012, Reser's sent an email to BEF with attached quarterly pricing for commodity sides; the subject line of the email stated "Updated formulation product pricing" and an attachment was entitled "Formulation pricing effective 11.01.12 thru 01.30.13.pdf." Hawkes Decl. Ex. 24.[9] For approximately ten days, BEF submitted orders for commodity sides at those prices, and Reser's accepted those orders. On November 14, Reser's informed BEF that it was raising prices for commodity sides due to "non-commodity based adjustments," with the price increase effective as of December 3, 2012. *Id.* Ex. 26. BEF objected to the price increase and asserted that Reser's was bound by the November 1 price quote through January 30, 2013. *Id.* Ex. 27. Reser's responded that it would accept orders only at the increased price for any supply to be delivered on or after December 3, 2012. Gerber Decl. Ex. 9 (doc. 214). BEF nonetheless attempted to submit orders for delivery of commodity sides on December 8 pursuant to the November 1 price quote. Reser's refused the orders, and BEF revised the orders to reflect the price increase of November 14. *Id.* at 8-9 & Ex. 9-10.

BEF argues that the parties' formula pricing agreement and performance in accordance with the agreement establishes that Reser's November 1 email served as a binding offer to supply commodity sides at the quoted price for the duration of the quarterly period ending on January 30, 2013. *E.g.,* Hall Decl. & Exs. 1-11 (doc. 215). Reser's maintains that the email was simply a price quote and lacked the necessarily detail, such as quantity terms, to constitute a binding offer. *Boydstun Metal Works*, 519 F. Supp. 2d at 1129-30.

---

[9] Another attachment was entitled "Formula pricing spreadsheet effective 11.12.12-01.20.12s.xls." The email stated: "Attached is the new formation pricing in detail as well as cover spreadsheet. Please note that we have moved the effective date of the price changes to deliveries of 11/12/12 to account for PO's already in our system." Hawkes Decl. Ex. 24.

I find that this claim, like BEF's MSA and formula pricing claims, depends on whether the parties extended the MSA and modified it to include the formula pricing agreement. If so, Reser's was obligated to comply with the November 1, 2012 price adjustment for the duration of the quarter. If the MSA was not so extended or modified, the email is not an enforceable contract and Reser's was not bound by the November 1 price quote.

Generally, a price quote is considered "an invitation for an offer, rather than an offer to form a binding contract," while "a buyer's purchase agreement submitted in response to a price quotation is usually deemed the offer." *Dyno Constr. Co. v. McWane, Inc.*, 198 F.3d 567, 572 (6th Cir. 1999) (citation omitted); *RPTS, Inc. v. FMC Tubular & Equipment Corp.*, 2012 WL 366876, at *1 (Ohio App. 2012). Granted, a price quote can constitute an offer if it is sufficiently detailed so that the other party's assent forms a binding contract. *Id.*; *Boydstun Metal Works,* 519 F. Supp. 2d at 1129. Ultimately, whether a communication is an offer or a price quote "depends primarily upon the intention of the person communicating the quotation as demonstrated by all of the surrounding facts and circumstances." *Dyno Constr. Co.*, 198 F.3d at 572; *see also Boydstun Metal Works*, 519 F. Supp. at 1129.

If the Reser's was not bound by the alleged formula pricing modification of the MSA, Reser's email simply invited BEF to order commodity sides at the quoted prices. Reser's email did not include quantity terms or delivery information and is not sufficiently detailed enough to constitute a binding "offer." *Boydstun Metal Works*, 519 F. Supp. 2d at 1130-31 (a communication must include the price and the quantity of goods to constitute a binding offer). For the same reasons, the November 1 email does not comply with the Statute of Frauds due to the lack of a quantity term. *Id.*

BEF nonetheless argues that the parties' delivery and acceptance of side dishes establish the existence of a contract and fall within the State of Frauds exception "with respect to goods for which payment has been made and accepted or which have been received and accepted." Ohio Rev. Code § 1302.04(C); Or. Rev. Stat. § 72.2010(3). However, any "meeting of the minds," or contract, between the parties covered only the goods delivered and received  at the November 1 price quote; it did not extend to goods delivered and received at the November 14 price. This particularly true when Reser's refused to accept additional BEF orders submitted at the November 1 price. Similarly, the Statutes of Frauds exception applies to goods delivered and accepted under the terms of the agreement sought to be enforced – in this case, the November 1 email. *E.g., Howland v. Iron Fireman Mfg. Co.*, 188 Or. 230, 215 P.2d 380, 385 (1950) ("the receipt and acceptance of the goods or a part thereof relied on to render the parol contract enforceable must be done in pursuance of the particular contract which it is sought to establish"); *see also H&M Landscaping*, 2010 WL 3441935, at *4 ("The statute of frauds precludes H&M from arguing that additional amounts were also included in the agreement because they are not evident in the document that H&M asserts is a contract."). Therefore, unless the MSA remained in effect and was modified to include the formula pricing agreement, Reser's November 1 email did not create an enforceable contract.

Accordingly, the parties' motions for summary judgment on BEF's November-January pricing claim are denied, as genuine issues of material fact remain regarding the MSA.

B.    Promissory Estoppel Claims

BEF also alleges promissory estoppel as alternatives to its formula pricing and supply contract claims. *See* BEF's Suppl. Ans. at 25-27, 55-57, 59-62 (Fourth Claim for Relief, Count 3; Third Suppl. Claim for Relief, Counts 3 and 5).

23 - OPINION AND ORDER

Both Oregon and Ohio recognize an affirmative claim of promissory estoppel to recover reliance damages. *See Olympic Holding Co. v. ACE Ltd.*, 909 N.E.2d 93, 100 (Ohio 2009) ("a party may not use promissory estoppel to bar the opposing party from asserting the affirmative defense of the statute of frauds…but may pursue promissory estoppel as a separate remedy for damages"); *Filo v. Liberato*, 987 N.E.2d 707, 712-13 (Ohio Ct. App. 2013); *Potter v. Hatter Farms, Inc.*, 56 Or. App. 254, 260, 641 P.2d 628 (1982) ("promissory estoppel should be allowed to defeat reliance upon the UCC Statute of Frauds").[10] Under the doctrine of promissory estoppel, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Cocchiara v. Lithia Motors, Inc.*, 353 Or. 282, 292, 297 P.3d 1277 (2013) (citation omitted). The elements of promissory estoppel are: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on the promise; and 3) damages as a result of the reliance. *JPMorgan Chase Bank v. Dattilo*, 2014 WL 6679575, at *2 (Ohio App. Nov. 26, 2014); *Moellering Indus., Inc. v. Nalagatla*, 2013 WL 5230678, at *4 (Ohio App. Sept. 16, 2013) (a "clear and unambiguous promise" is required for promissory estoppel); *Furrer v. Sw. Or. Cmty. Coll*, 196 Or. App. 374, 382, 103 P.3d 118 (2004).

---

[10]Reser's concedes that Oregon does not bar a claim of promissory estoppel when the Statute of Frauds precludes a contract claim; however, it argues that the law of Ohio should apply, and that Ohio does not allow a promissory estoppel claim to defeat the Statute of Frauds unless a party misrepresents compliance with the statute's requirements or a promise to execute a memorandum of the alleged agreement. *Huntington v. R.R. Wellington, Inc.*, 983 N.E.2d 941, 949 (Ohio App. 2012). I disagree. In *Olympic Holding Co.*, the Ohio Supreme Court made clear that promissory estoppel does not create an exception to the Statute of Frauds, though it may be brought as an affirmative claim to recover reliance damages. 909 N.E.2d at 100; *see also Filo*, 987 N.E.2d at 712 ("Promissory estoppel, itself, does not operate as an exception to the statute of frauds. Instead,…promissory estoppel specifically exists to provide an action for damages to compensate a party injured due to his reliance on an unenforceable promise.")

I find that BEF submits sufficient evidence to raise a genuine issue of fact as to whether Reser's promised to provide BEF with ongoing supply through 2013. In its August 23, 2012 letter to BEF, Reser's explicitly stated: "To be clear, [Reser's] will continue to fill all other products orders with the quality and service you've come to expect from Reser's over the years." Hawkes Decl. Ex. 12 at 2. This letter alone raises the inference that Reser's promised ongoing supply, an inference made stronger in light of the parties' course of dealing. After August 2012, BEF continued to provide forecasts and submit purchase orders, and Reser's continued to fill those orders. *E.g.* Brunette Decl. 11 (Townsley Dep. at 183:1-12). Further, in February 2013, Reser's requested that BEF provide a potato forecast for August 2013 through August 2014, stating that Reser's "wants to be in a position to fill your needs." Brunette Decl. Ex. 79. It is a much closer call whether BEF presents sufficient evidence to show that it reasonably relied on a promise from Reser's to continue supply through 2013.

After the Kettle Creations purchase, it is undisputed that BEF became concerned that Reser's would terminate the parties' supply arrangement. *See, e.g.,* Hawkes Decl. Ex. 6 (Townsley Dep. 144:16-23) (testifying that after the Kettle Creations purchase, BEF recognized the risk that Reser's could terminate all supply); Ex. 14 (Klausing Dep 142:4-143:16 (testifying that Reser's potential termination of supply was one of BEF's "biggest concerns"); Ex. 15 (Mulherin Dep. 124:12-23) (acknowledging the possibility that Reser's could terminate supply). After Reser's refused to provide a written supply commitment, BEF instructed its high level managers to "assume that as of January 1st Reser's cuts us off entirely" and to determine what sides BEF could produce at the Kettle Creations plant. Hawkes Decl. Ex. 21 at 2; *see also id.* Ex. 34 (Mar. 2013 email of BEF acknowledging "the real possibility that Reser's may throw us out in the next several months").

25 - OPINION AND ORDER

In November 2012, BEF launched Project XR ("Exit Reser's"), a plan to assess BEF's capability to produce its own side sides and to identify alternative co-packing arrangements. Hawkes Decl. Ex. 4 (Hall Dep. 158:1-159:17, 179:4-7), Ex. 6 (Townsley Dep. 124:19-25, 146:4-11, 188:1-12), Ex. 15 (Mulherin Dep. 143:7-144:4, 152:10-153:9, 172:13-173:3, 180:11-21), Ex. 17 (DeNunzio Dep. 28:2-7), Ex. 28. Throughout 2013, BEF expressed either the intent or the desire to "exit" its relationship with Reser's "as soon as possible" or by March, June, July, or ultimately August of 2013. Hawkes Decl. Ex. 14 (Klausing Dep. 96:12-22, 119:9-15) (testifying that BEF discussed a plan to reduce Reser's orders to "zero"); *see also id.* Exs. 31, 32 at 2, 33, 34, 36 (Dec. 2012 email from BEF indicating that "all" production would be "shifting" from Reser's to Kettle); 37-41. In July 2013, BEF expressed heightened concern that Reser's "may cut us off sooner than expected or not fulfill what we have forecasted." *Id.* Ex. 53. Reser's emphasizes that BEF admitted that it "explored every option available" and "did everything that [it] could do" to increase its internal production capability and find other co-packers for all products produced by Reser's. Hawkes Decl. Ex. 47 (Nimmons Dep. 145:16-24), Ex. 15 (Mulherin Dep. 161:17-163:13). While BEF "didn't know if [Reser's was] going to continue to supply [sides] or not," "everyone assumed" that Reser's would eventually terminate supply "[b]ecause each party was suing each other, competitive in the marketplace, you had to figure something bad was going to happen." *Id.* Ex. 14 (Klausing Dep. 180:4-23).

Given this evidence, Reser's maintains that BEF did not rely on any promise by Reser's and instead made every effort to obtain an alternative source of supply, and that BEF's unsuccessful attempt to find a supplier should not transform its conduct into actual reliance. In response, BEF downplays the significance of Project XR, maintaining that it was nothing more than a "contingency plan" to address a myriad of "what if" situations and to minimize potential

26 - OPINION AND ORDER

damage in the event Reser's "breached" the parties' agreement and terminated all supply. *See* Brunette Decl. Ex. 4 (Hall Dep. 178:14-17, 183:1-184:4); Ex. 11 (Townsley Dep. 242:3-16, 285:18-286:1); Ex. 116 (Mulherin Dep. 21:6-22:19, 148:9-16, 152:7-153:9, 175:3-178:24, 251:7-253:9, 273:11-15); Ex. 117 (Nimmons Dep. 93:3-14). BEF notes that as of 2012, Reser's supplied BEF with approximately 50% of its refrigerated side dish requirements, and that BEF intended to maintain that percentage through 2013. *See* Brunette Decl. Ex. 11 (Townsley Dep. 137:21-23, 157:6-158:8). BEF further contends that it had no intention of abandoning its supply relationship with Reser's entirely, given that it had no other reliable source of supply for the products produced by Reser's. Brunette Decl Ex. 11 (Townsley Dep. 129:3-130:23, 131:13-20, 132:14-19, 133:14-134:2, 139:2-9, 146:12-147:1, 157:18-158:8, 183:1-12, 258:8-18, 280:10-14); Ex. 116 (Mulherin Dep. 53:21-25, 166:22-168:15, 180:20-21, 199:5-11).

I find this issue to be a very close call. As Reser's argues, internal BEF documents seemingly reflect its all-out effort to replace Reser's as a supplier in 2013, negating BEF's claim that it relied on Reser's promise to provide ongoing supply. At the same time, the deposition testimony of BEF officers and employees paint a difference picture and place the internal documents and communications in a different, hypothetical context. Ultimately, I find that the credibility of witness testimony and the issue of BEF's reliance are questions for the trier of fact.

Reser's also argues that even if the evidence creates a genuine issue of material fact as to BEF's reliance, its reliance was not reasonable. Reser's points out that in September and October 2012, BEF pressed Reser's for a one-year commitment for continuing supply, and Reser's gave no commitment. *E.g.* Hawkes Decl. Ex. 19. In the summer of 2013, BEF again attempted to obtain a commitment from Reser's to provide holiday sides through December 2013 and again received no commitment. *Id.* Ex. 50. Despite the lack of commitment, BEF nonetheless offered

27 - OPINION AND ORDER

holiday sides to its customers and indicated that they would be available in October 2013. Hawkes Decl. Ex. 13 (Lambrix Dep. 158:18-21), Ex. 57. Reser's strenuously argues that BEF is a "highly sophisticated entity," and the reasonableness of its alleged reliance on Reser's should be held to a higher standard. *E.g.*, *Or. Pub. Employees' Retirement Bd. v. Simat, Helliesen & Eichner*, 191 Or. App. 408, 428, 83 P.3d 350 (2004) (a party that "is a large and sophisticated organization that has at its disposal a small army of attorneys, accountants, and hired experts" may be "unjustified" in relying on another's representations); *Miami Packaging, Inc. v. Processing Sys., Inc.*, 792 F. Supp. 560, 565 (S.D. Ohio 1991) (reliance was not reasonable as a matter of law when the party knew that the promise "might not come to fruition").

Granted, BEF's alleged reliance on Reser's promise to continue supply might have been unreasonable in light of Reser's August 2012 discontinuation of baked side dish supply, Reser's alleged breach of the formula pricing agreement, Reser's 2013 lawsuit against BEF, and Reser's refusal to provide a firm supply commitment in 2013. At the same time, in October 2012 Reser's assured BEF that it would continue to supply BEF with side dishes, and, aside from the lack of commitment, Reser's acted in accordance with the parties' past dealings by filling orders and requesting forecasts. Further, BEF contends that Reser's concealed its intent to terminate supply for several months, leading BEF to believe that it would provide supply throughout the 2013 holiday season. *E.g.*, Brunette Exs. 15-21. Whether BEF's alleged reliance was reasonable or even plausible in these circumstances remains a question of fact. *Cocchiara*, 353 Or. at 293, 297 P.3d 1277 ("reasonableness is an issue for the jury"). Accordingly, summary judgment is denied on BEF's promissory estoppel claims regarding ongoing and holiday supply.

However, no question of fact precludes summary judgment on BEF's promissory estoppel claim with respect to the parties' formula pricing agreement. As Reser's argues, BEF

admitted that the formula pricing agreement had no established termination date, and that Reser's made no promise to continue the agreement indefinitely. Reser's Mem. in Support at 27-29; Hawkes Decl. Ex. 4 (Hall Dep. at 105:9-22, 109:7-110:7). Further, in response to Reser's motion, BEF cites no evidence to show that it reasonably relied on Reser's promise to make annual and quarterly price adjustments. BEF's Opp'n at 41-43. Therefore, summary judgment is granted on BEF's promissory estoppel claim regarding the formula pricing agreement.

C.      Fraud Claim

In its Second Supplemental Claim for Relief, BEF asserts a claim for fraud and alleges that Reser's deceptively led BEF to believe that it would continue to provide hot-fill items through 2013. To establish a claim for fraud, a party must prove: 1) a false, material misrepresentation; 2) made with knowledge of its falsity; 3) an intention that the falsity be relied upon; 4) justifiable reliance on the misrepresentation; and 5) damages as a result of the reliance. *Strawn v. Farmers Ins. Co. of Or.*, 350 Or. 336, 352, 258 P.3d 1199 (2011). Reser's argues that BEF presents no facts to establish a false, material misrepresentation on its part, or justifiable reliance on any alleged misrepresentation. I disagree.

BEF maintains that Reser's knew in mid-2013 that it intended to terminate the parties' ongoing supply arrangement but nevertheless led BEF to believe that it would continue to provide hot-fill side dishes. BEF relies on Reser's communications in May 2013 directing Reser's employees to cease or reduce orders for raw materials, trays, boxes, and external packaging ("sleeves") for BEF products and to plan on ceasing production of BEF products by fall of 2013. Brunette Exs. 15-20, 21 (Aug. 2013 email stating Reser's had "been running down sleeve inventory for months in anticipation of a September cut-off date"). During the same time period, Reser's continued to request forecasts from BEF for products such as green beans and

29 -  OPINION AND ORDER

apples, for example, telling BEF that raw food suppliers needed "to get projections in ASAP." Gerber Decl. Ex. 10. However, Reser's admitted that raw food suppliers did not request projections and that the statement was false. Brunette Decl. Ex. 6 (MacLennan Dep. 168:14-169:6). In other words, BEF argues that from May through August 2013 – when BEF was making supply commitments to retailers – Reser's acted as if it would continue to supply BEF with sides while secretly preparing to terminate supply. BEF maintains that Reser's timed the termination of supply to coincide with the holiday season and the accompanying "spike" in side dish sales so that BEF could not fill its customers' orders.

Reser's counters that BEF's interpretation of the evidence is not plausible, and that it simply reduced the amount of BEF packaging and other materials in response to BEF's dramatic reduction in orders, an action which BEF recognized as "normal." *See* Hawkes Decl. Ex. 10 (July 2012 email indicating that BEF intended to order approximately 20% less volume than forecasted); Suppl. Hawkes Decl. Ex. 1 (Gerber Dep. 208:7-23), Ex. 2 (MacLennan Dep. 78:5-18, 111:17-25, 113:19-114:24, 117:7-15), Ex. 3 (Solvie Dep. 85:11-86:11) (testifying that Reser's expressed concern about excess inventory if BEF's business went elsewhere). Reser's further argues that its alleged failure to notify BEF of a potential supply termination is not actionable as fraud. *See Gregory v. Novak*, 121 Or. App. 651, 655, 855 P.2d 1142 (1993) ("Silence in the absence of a duty to speak is not a representation").

"One species of a misimpression that will give rise to an actionable claim in fraud is a promise made with the knowledge that it will not be performed or with reckless disregard about whether it will be performed." *Estate of Schwarz v. Philip Morris, Inc.*, 206 Or. App. 20, 39, 135 P.3d 409 (2006); *see also Heise v. Pilot Rock Lumber Co.*, 222 Or. 78, 86, 352 P.2d 1072 (1960) ("It is well settled that the suppression of a material fact which a party is bound in good faith to

disclose is equivalent to a false representation.") (citation omitted); *Wieber v. FedEx Ground Package System, Inc.,* 231 Or. App. 469, 484, 220 P.3d 68 (2009) ("even in the absence of a duty to speak, actions by a defendant to actively conceal the truth can constitute fraud"). Given the evidence of record as discussed above, I find that questions of fact exist as to whether Reser's misrepresented its willingness to continue supply and whether BEF justifiably relied on that misrepresentation to its detriment.

D.    Intentional Interference With Economic Relations Claim

In its First Supplemental Claim for Relief, BEF's alleges that Reser's intentionally interfered with the economic relationship between BEF and its customers by discontinuing the supply of hot-fill and seasonal sides. To establish a claim for intentional interference with economic relationships, a party must show: 1) the existence of a professional or business relationship; 2) intentional interference with that relationship; 3) by a third party; 4) accomplished through improper means or for an improper purpose; 5) a causal effect between the interference and damage to the economic relationship; and 6) damages. *McGanty v. Staudenraus,* 321 Or. 532, 535, 901 P.2d 841 (1995). Reser's contends that BEF cannot establish intentional interference or improper means or purpose.

Reser's argues that no facts suggest that it intended to interfere with BEF's business relationships or that it knew such interference was substantially certain to occur as a result of the termination of supply. *Straube v. Larson,* 287 Or. 357, 361, 600 P.2d 371 (1979) (element of intentional interference may be met if the defendant knew that interference was "substantially certain" to occur); *Aylett v. Universal Frozen Foods Co.,* 124 Or. App. 146, 152-53, 861 P.2d 375 (1993). Aside from the fact that BEF sought a supply commitment during 2013, Reser's maintains that BEF provides no evidence that Reser's knew that the termination of supply would

31 -  OPINION AND ORDER

interfere with BEF's other business relationships. Reser's emphasizes that it stopped supplying BEF almost one year after BEF announced its acquisition of Kettle Creations and the "nearly $27 million expansion" of the Kettle plant, and after BEF had reduced its total volume of purchases from Reser's by 83 percent. Hawkes Decl. Exs. 45, 46 (Mark Reser Dep. 95:3-16, 197:7-25), 62. Reser's also contends that BEF itself did not know whether Reser's termination of supply would interfere with its customer relations, because it did not notify customers of a supply problem until October 2013. *Id.* Ex. 13 (Lambrix Dep. 158:14-21, 188:7-15, 193:14-194:1) (testifying that BEF notified customers about the lack of supply when it "was certain" it had a supply issue). Given these facts, Reser's argues that it could not have known that BEF would be unable to meet its customers' demands as a result of Reser's decision.

I find that the evidence raises genuine issues of fact regarding Reser's intent and knowledge. For example, as Reser's emphasizes, BEF sought assurances from Reser's that it would continue to supply holiday and other hot-fill dishes, raising the inference that BEF continued to rely on Reser's for its hot-fill sides and that Reser's was aware of BEF's reliance. Brunette Decl. Ex. 6 (MacLennan Dep. 205:1-17, 206:2-14), Ex. 9 (Sakie Dep. 193:17-195:6, 248:20-249:16); *see also id.* Exs. 12, 22, 51. BEF also presents evidence that Reser's took steps to terminate supply for months and failed to disclose this fact to BEF, even as BEF was seeking assurances from Reser's. Brunette Decl. Exs. 15-21. Notably, Reser's gave some indication to BEF that it would supply holiday sides and did not explicitly terminate supply until late August. Brunette Decl. Ex. 79; Gerber Decl. Ex. 9. These actions could raise the inference that Reser's deliberately terminated the supply relationship during the peak holiday season when BEF would suffer the most damage from its inability to meet customer side-dish demands.

Further, BEF points to evidence that Reser's knew BEF would be unable to obtain a sufficient source of supply for its holiday needs if Reser's discontinued supply. Brunette Ex. 6 (MacLennan Dep. 205:1-17, 206:2-15), Ex. 9 (Sakie Dep. 193:17-195:6, 248:20-249:16), Exs. 12, 22 (Reser's email in August 2013 stating that the Kettle Creations plant could not meet all of BEF needs and that "It will be interesting to hear what happens to BEF this fall"), Ex. 51. The fact that BEF did not inform customers of a supply problem until October 2013 does not necessarily mean that it did not realize it had a supply problem, or Reser's could not have known of a problem, at the time Reser's terminated supply. If, as BEF maintains, the parties were in the midst of settlement discussions, a potential resolution would have rendered any notice to BEF customers premature. *See* Townsley Decl. at 6-7. Finally, BEF presents evidence that Reser's sought to displace BEF products with its own and gain a greater share of the market, and that the termination of BEF's supply furthered this goal. *See* Brunette Decl. Exs. 28, 30, 55-57, 62, 71, 77, 82.

If construed in BEF's favor, these facts support the inference that Reser's intended to interfere with BEF's customer relationships to further its own business interests, and that Reser's knew interference with BEF customers was likely to occur if it refused to supply BEF with hot-fill and seasonal sides. While Reser's relies on the deposition testimony of its employees and its sleeve supplier to establish that it had no nefarious plan to terminate supply and interfere with BEF's customer relationships, it is for the trier of fact to evaluate the credibility of witness testimony. *See* Reser's Reply Mem. at 29-30; Suppl. Hawkes Decl. & Exhibits.

Reser's also maintains that no evidence shows that Reser's acted through improper means or for an improper purpose. Though I find this argument more persuasive, genuine issues of material fact nonetheless preclude summary judgment.

33 - OPINION AND ORDER

If liability for intentional interference is based on an improper purpose, the purpose "must be to inflict injury"; if liability is based on improper means, the means "must violate some objective identifiable standard, such as a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession." *Nw. Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or. 487, 498, 982 P.2d 1117 (1999). "Commonly included among improper means are violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201, 210 n.11, 582 P.2d 1365 (1978).

BEF contends that Reser's terminated supply in order to gain a competitive advantage over BEF and become a "national brand" at BEF's expense. BEF's Opp'n at 18-19; *see also* Brunette Decl. Exs. 28, 31, 55-58, 62, 78. Generally, actions in furtherance of competitive business interests do not constitute improper means or an improper purpose to support a claim of intentional interference. *Robinson v. Charter Practices Int'l, LLC*, 2015 WL 1799833, at *15-16 (D. Or. Apr. 16, 2015); *N. Pac. Lumber v. Moore*, 275 Or. 359, 369, 551 P.2d 431 (1976). However, BEF's allegations go beyond the typical furtherance of a business interest; BEF asserts that Reser's breached the parties' supply agreement out of retribution, and that Reser's fraudulently and deceptively misrepresented its intent to terminate supply in order to cause greater harm to BEF. *See Wanke Cascade Dist. Ltd. v. Forbo Flooring, Inc.*, 2013 WL 6493099, at *5-6 (D. Or. Aug. 20, 2013) (business competitors' privilege does not apply if the competition uses improper means); Restatement (Second) of Torts § 766, cmt. r (1979) ("Satisfying one's spite or ill will is not an adequate basis to justify an interference and keep it from being improper."); *see also id.* § 767 (factors relevant to whether interference is improper include the defendant's motive and interests sought to be advanced).

34 - OPINION AND ORDER

BEF produces evidence that Reser's imposed sharp price increases, cut off supply and brought suit against BEF in retaliation for BEF's business decisions that negatively affected Reser's. *E.g.* Brunette Decl. Ex. 34, 52, 65, 115. The evidence supports an interference that Reser's motives were retaliatory, which is "sufficient to satisfy the improper motive requirement." *Aylett*, 124 Or. App. at 153, 861 P.2d 375 (citing *Straube,* 287 Or. at 368, 600 P.2d 371). Whether Reser's ultimate decision to terminate supply was, in fact, motivated by retaliation is a question for the finder of fact.

Further, as noted above, BEF presents evidence suggesting that Reser's began taking steps to terminate supply months earlier and did not disclose this fact when BEF sought assurances from Reser's. Brunette Decl. Exs. 15-21; Gerber Decl. 7-14 & Exs. 10-15. BEF also submits evidence that Reser's pushed BEF to provide a forecast for holiday sides and falsely asserted that wholesale suppliers demanded projections, even as Reser's planned to terminate supply to BEF. Brunette Decl. Exs. 6 (MacLennan Dep. 168:2-169:11), 124, 128. BEF also presents evidence that Reser's shut down the recently-acquired Delphos manufacturing plant after determining that other Reser's facilities could accommodate the volume of side dishes produced at Delphos if Reser's no longer supplied BEF. Reser's then notified BEF that it no longer had capacity to meet BEF's supply needs. Brunette Decl. Exs. 32-33, 35, 53. Although the evidence may support the inference that Reser's "was pursuing its legitimate business purposes, that is not necessarily the only conclusion that reasonably may be drawn from the evidence." *Aylett*, 124 Or. App. at 153, 861 P.2d 375.

BEF also argues that Reser's interfered through improper means by violating an industry standard of reasonable notice and collaboration before terminating an ongoing supply agreement. BEF relies on the UCC and the expert opinion of Robert Nardone to support an industry

35 - OPINION AND ORDER

standard. The UCC provides that contracts for the sale of goods with no express duration may be terminated at will upon reasonable notice. Or. Rev. Stat. § 72.390; Ohio Rev. Code § 1302.22. Mr. Nardone further opines that a well-recognized trade standard and expectation in the food supply industry requires a co-packer to cooperate and collaborate with its supply partner and determine what notice would be reasonable before terminating a supply agreement. Nardone Decl. Ex. 1 at 27. Mr. Nardone contends that nine months' notice would have been reasonable in the circumstances of this case. *Id.* Ex. 1 at 38.

Reser's maintains that the parties had no enforceable contract, and therefore the UCC standard does not apply to BEF's tort claim. However, as discussed above, it is a question of fact whether the parties extended the MSA. Further, the evidence supports the existence of an implied ongoing agreement; even the agreement is unenforceable under the Statute of Frauds, the UCC standard of reasonable notice remains relevant to the existence of an industry standard. *See Wanke*, 2013 WL 6493099, at *7 (recognizing UCC standards in context of intentional interference claim); Or. Rev. Stat. § 72.3090, cmt 8 ("the application of principles of good faith and sound commercial practice normally call for such notification of the termination of a going contract relationship as will give the other party reasonable time to seek a substitute arrangement"); *id.* § 72.2010, cmt. 4 (contract unenforceable under the Statute of Frauds is not "void for all purposes").

Finally, Reser's argues that BEF cannot show an established or recognized industry standard that requires collaboration among co-packers or a specific notice of termination. *See Volt Servs. Group v. Adecco Employment Servs., Inc.*, 178 Or. App. 121, 131-32, 35 P.3d 329 (2001) (finding that published industry guidelines established "recognized" industry standards). Reser's contends that Mr. Nardone's opinion is unreliable and should be excluded, because he

36 - OPINION AND ORDER

failed to identify any evidence supporting the existence of a true industry standard and no reliable methodology supports his subjective opinion. *See* Fed. R. Evid. 702 (a witness "qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the testimony "will help the trier of fact," and the testimony is reliably supported by facts, principles, and methods).

I agree with Reser's that Mr. Nardone's opinion does not support the existence of an industry standard of co-packer collaboration or reasonable notice distinct from the UCC standard. Mr. Nardone does not cite data compilations, regulations, published guidelines, or any industry publication to support his opinion. Eggum Decl. Ex. 2 (Nardone Dep. 10:2-13, 53:3-19, 60:7-61:3) (doc. 243) (testifying that no publication discusses an industry notice-of-termination standard, and no regulation governs the termination of supply). Further, Nardone's opinion does not describe *specific* examples of collaboration in the industry that he has personally experienced or witnessed prior to the termination of a supply agreement. Nardone Decl. Ex. 1 at 27-28. "If an expert is relying solely or primarily on experience, then the expert 'must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Siring v. Or. State Bd. of Higher Educ. ex rel. Eastern Oregon Univ.*, 927 F. Supp. 2d 1069, 1074 (D. Or. 2013) (quoting Fed. R. Evid. 702 Advisory Committee notes); *see also Arjangrad v. JPMorgan Chase Bank, N.A.*, 2012 WL 1890372, at *5 (D. Or. May 23, 2012) (finding expert testimony based on experience unreliable where the expert did not "offer any personal observations or data gathered from his experience demonstrating that large companies actually adhere to these standards"). Here, Mr. Nardone fails to explain how and why his experience supports the conclusion that food supply companies collaborate before terminating an ongoing supply agreement.

37 - OPINION AND ORDER

Rather, Mr. Nardone essentially opines that reasonable notice of termination in the food supply industry is "situational." Eggum Decl. Ex. 2 (Nardone Dep. 8:18-9:3) (doc. 243). Mr. Nardone's opinion is more relevant to the nature of the co-packing industry generally and the factors relevant to determine reasonable notice of termination in the context of an ongoing supply agreement; it does not support an "established" industry standard governing notice of termination. Therefore, Reser's motion to exclude is granted to the extent that Mr. Nardone may not testify about an industry standard regarding the termination of supply agreements.

Reser's also argues that Mr. Nardone's opinion should be excluded in its entirety as irrelevant and unreliable, because it is not supported by reliable methodology, does not involve specialized knowledge, and fails to consider pertinent facts. However, in light of Mr. Nardone's experience in the industry, his testimony could be helpful to the jury in understanding the intricacies of supply chain relationships. *E.g.,* Nardone Decl. Ex. 1 at 6-10; Fed. R. Evid. 702, 703; *Hangarter v. Provident Life Acc. Ins. Co.*, 373 F.3d 998, 1017-18 (9th Cir. 2004) (no error in admitting expert testimony based on knowledge and experience rather than "a particular methodology or technical framework"); *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) (reliability factors such as peer review, publication, and potential error rate "simply are not applicable" to expert testimony based "on the knowledge and experience of the expert, rather than the methodology or theory behind it").

Regardless, aside from the industry standard issue, at this juncture I need not decide whether and to what extent Mr. Nardone will be allowed to testify at trial. For purposes of BEF's intentional interference claim, I find that his opinion fails to establish an industry standard of collaboration or reasonable notice and Reser's motion to exclude is granted on that basis. Reser's motion is otherwise denied, with leave to renew in pretrial motions.

38 - OPINION AND ORDER

## CONCLUSION

For the reasons explained above, Reser's Motion for Summary Judgment (docs. 209, 211) is GRANTED in part, and BEF's Motion for Partial Summary Judgment (doc. 212) is DENIED. Count 3 of BEF's Fourth Claim for Relief and Counts 2 and 4 of BEF's Third Supplemental Claim for Relief are HEREBY DISMISSED. Reser's Motion for Summary Judgment is denied in all other respects. Reser's Motion to Exclude (doc. 242) is GRANTED in part. BEF expert Robert Nardone may not testify to the existence of an industry standard that requires collaboration between co-packers and a specific notice period before the termination of supply agreements. Reser's motion is otherwise denied with leave to renew prior to trial.

The Court strongly encourages the parties to contact Magistrate Judge Coffin's chambers to pursue additional settlement efforts to resolve this long and costly litigation.

IT IS SO ORDERED.

Dated this 13 day of July, 2016.

Ann Aiken
United States District Judge